368

(No. 4969-)

Arthur Hammond, Claimant, vs. State of Illinois, Respondent.

Opinion filed March 29, 1963.
Petition of Claimant for Rehearing denied July 26, 1963.

Robert P. Shonkwiler, and Appleman, Zimmerly and McKnelly, Attorneys for Claimant.

William G. Clark, Attorney General; Lawrence W. Reisch, Jr., Assistant Attorney General, for Respondent.

Tolson, J.

This action was brought to recover damages for injuries to claimant occasioned by the alleged negligence of the State in failing to place a warning post or sign, where it had removed the headwall or protruding abutment of a culvert, on the shoulder of a public highway, which resulted in the remaining portion of the culvert and ditch being invisible to users of the shoulders. No questions were raised on the pleadings.

Plaintiff's theory is that respondent is liable for damages resulting from its failure to install adequate warning posts or signs indicating the presence of the concealed culvert. The State had adequate notice of the defect, and its plans called for a warning post to be in place at the scene of the injury, since at least the preceding April. The injury herein complained of occurred on October 2, 1959. Respondent admitted there were no warning devices present on the date of the injury.

This case was heard by Commissioner George W. Presbrey on May 18, 1961, and on November 9, 1962 he filed an exhaustive report, the first seven and one-half pages of which are in the following words and figures:

"The evidence was heard in the above entitled cause on May 18, 1961 at Monticello, Illinois. Phillip C. Zimmerly and Robert Shonkwiler represented claimant, Arthur Hammond, and Lawrence W. Reisch, Assistant Attorney General, represented respondent, State of Illinois.

"This action was brought by claimant, Arthur Hammond, to recover damages for injuries to him by the alleged negligence of the State of Illinois in failing to place a warning post or sign where it had removed the headwall or protruding abutment of a culvert on the shoulder of a public highway. The claimant contends that, as a result of the removal of this headwall, the remaining portion of the culvert and ditch became invisible to users of the shoulder of the highway. The claimant was driving a tractor, without lights, on the shoulder of the road. He did not notice the culvert and ditch. His tractor overturned, causing serious injuries. The accident occurred at 6:35 A.M. on October 2, 1959. It is admitted that there was no warning post or sign present on the day of the accident.

"The accident in question occurred on Illinois State Highway No. 10, at a point between 1 and 1½ miles east of DeLand, Piatt County, Illinois. Route No. 10 is a conventional, two lane concrete highway, 18 feet wide, centered on a right of way 40 feet wide. The shoulders on each side are approximately 11 feet wide. The highway is flat and level, and runs directly east and west. The weather on the day of the accident was clear. Usually at this hour at this time of year the sun had been up, but there had been an eclipse of the sun on the morning in question, so that it was still dark at the time of the accident, and the vehicles using the highway had lights on.

"The culvert in question is located about 400 feet east of the farmhouse known as the Clifton Home. It had originally been a conventional box culvert with a protruding headwall or abutment above the shoulder. There is a conflict as to whether the abutment or headwall protruded 10 inches or 18 to 24 inches before it was removed. Sometime between April 21 and May 17, 1959, respondent had removed the headwalls either 6 or 8 inches below the ground level.

"At the time of the accident, claimant was driving east on a tractor owned by his employer. He had taken feed to the tenant house where he lived, and he had been instructed to return the tractor and wagon on the morning he was injured. The claimant was late for work, his usual hours of employment being from 6:00 A.M. to 6:00 P.M., six days a week. He had waited for the sun to rise and for it to get light, because there were no lights on either the front or rear of the tractor, or on the wagon he was pulling. The head lamp of the tractor had been removed by the employer, and the tail light was not working. As previously stated, there had been an eclipse of the sun on the morning in question. There were no rays of

the sun visible nor any land marks, as he was driving, and, in the words of claimant, 'It was light enough that I could see objects. It was light enough to have seen a stick there at the culvert.'

"Claimant lived on a 24 acre farm owned by his employer. He worked primarily on the employer's 640 acre main farm. The main farm was 3½ miles north and east of the tenant place. The tenant place was south of Route No. 10, and the section line road going north did not go beyond Route No. 10. It was a dead end pavement. Claimant had to take Route No. 10 to the east for at least one mile, and then he could turn north on another section line at the Clifton house. On the south side of Route No. 10 and the mile he had to traverse, there were two culverts with headwalls broken off. The first was about 1/10 of a mile from where he turned onto Route No. 10. He thought he had passed the second culvert at the time of the accident. He could not see it from the pavement. On the same mile on Route No. 10 there were three other field entrance culverts on the right of way, which remained with their full headwalls. Claimant stated that they were visible to him, as he drove along.

"Claimant normally drove to work in his 1952 Ford, which had conventional lights. He had never before driven between the places in the dark on a tractor.

"Claimant stated that he kept watching for traffic approaching from either direction. When he saw headlights behind him, he drove off onto the shoulder, so that he would not be hit, because he didn't have any lights on the tractor or the wagon. He stated that he kept looking directly ahead of him, and got far enough off, so that the oncoming traffic would not sideswipe him. He continued driving forward until he dropped off into the hole. The rear wheel of the tractor fell off the edge. The front wheels of the tractor passed the concealed culvert. He was not struck by another car. The right rear tire tread of the tractor could be traced straight west of the culvert 40 feet, and the marks of its lugs clearly appeared on the remaining portion of the headwall after the accident, which showed where they had slipped off of the southern declining edge.

"The tractor in question was six feet wide. Riding on the center of the tractor, claimant was about eight feet south of the edge of the pavement. The seat of the tractor was five feet off the ground. The rear wheels of the tractor were 6 feet 4 inches from the outside to outside. They were large, shoulder height wheels.

"A westbound driver, driving a tractor trailer with dim lights, saw what he thought was a big piece of tar paper blown across the road. The driver stated, 'As I approached it, it turned out to be a tractor lying in the ditch, upside down.'

"Following the accident, claimant blacked out, but was unconscious only momentarily. Persons arriving at the scene tried to move him, but he was in too much pain. He was subsequently removed, and taken by ambulance to the hospital in Monticello. After the X-Rays he was taken to St. Mary's Hospital in Decatur.

"He had a comminuted inter-trochanteric fracture of the right hip, with marked displacement. There was a fracture of the acetabulum on the left

side, a fractured pelvis, a fracture of the left scapula, contusions of the abdomen, abrasions of the right leg and extensive perineal contusions. The fractured right hip was held in place with a Jewett 4½ inch nail, which is permanently imbedded in the hip of claimant. He had a delayed union of the femur, which has delayed his recovery. A pressure sore on the groin developed from being on the operating table, where he had to have extension on both legs pulling against the post of the groin. The post pressed against cords, which became infected. The testicle became inflamed, which could, and did, affect his potency. He is now impotent.

"Following the accident, claimant was in bed for two weeks, was ambulatory in a walking device, and was then trained in the use of crutches. Dr. Ciney Rich testified that it would be at least a year before claimant could throw away the crutches, and, at the time of his testimony, the patient was totally disabled. How long he would remain in this condition depended upon the union he had in the area of his main fracture. The doctor hoped this would be within a year's time. The patient lost approximately 15 lbs. following the accident. He has considerable atrophy of the right leg from the hip to the ankle. However, the doctor stated that a lot of the muscular strength should return when he can use the leg. Claimant has some loss of motion in the hip joint. The right thigh measured 37 centimeters in circumference compared to 43 centimeters in the left. The right calf is 28 centimeters as compared with 30 centimeters. The doctor stated that he would suffer a permanent impairment in the use of his right leg in the amount of 30 to 35%.

Claimant's medical expenses, totalling $1,642.35, were as follows:

| | |
|---|---|
| Dr. A. D. Furry | $ 20.00 |
| Kirby Hospital, Monticello | 20.50 |
| Trigg Funeral Home, ambulance services | 25.00 |
| Dr. J. F. Allman, Jr. | 5.00 |
| Dr. Ciney Rich | 600.00 |
| St. Mary's Hospital, Decatur | 68.75 |
| Raycraft Drug Co., Decatur | 6.85 |
| St. Mary's Hospital, Decatur, for care from October 2 to November 4, 1959, inc. | 896.25 |

"In addition to the above medical expenses, claimant has been unemployed since the day of the accident, October 2, 1959. He worked for his employers for six or seven years. Each month he received $210.00 in cash; house rent free, worth $30.00 a month; a cow, its feed, and the milk therefrom, worth approximately $20.00 to $30.00 a month; the cost of gasoline going back and forth, about 20 gallons a month at 31c a gallon. Since the accident the wife has been the sole support of the family, although before the accident she was not employed.

"Claimant cannot dress or bathe himself. His wife must do this for him. He cannot sit long. He was using crutches at the time of the hearing, and he cannot get around without them. It was stated that he is nervous, easily upset, moody, short tempered, and is unable to drive a car. He is despondent over not being able to make a living, nor having worked since

October 2, 1959. He is unable to tie his shoes, or put on his socks. The claimant is 47, and has been married to his wife, who is 40 years old, since November, 1938. They have two boys, age 8 and 16. He has a life expectancy of 24.41 years.

"John C. Mulgrew, a Civil Engineer, employed by the Illinois Division of Highways, District No. 5, testified that he was Assistant Maintenance Engineer in the area of the accident on October 2, 1959. In 1959, he stated that he had issued instructions to the Field Engineer that all roads leading to Champaign be mowed by October 3rd in preparation for the Illinois-Army Football game. The engineer stated that the purpose of the shoulder of the road is to be used as a transition from the edge of the pavement to a ditch and also for emergency stopping. The State usually cuts the grass of the shoulder three times a year to the ditch line. Fence mowing takes place twice a year. The time of the mowing depends upon the seasonal growth of the grass. The first mowing would be about the latter part of May, and the second around the first part of July. After Labor Day in September would be the beginning of the final mowing.

"The part of the headwalls above ground were removed by the labor unit, which operates over the State out of the Springfield Bureau of Maintenance. The engineer testified that, in his opinion, headwalls protruding above the ground on culverts are an unsafe condition.

"On cross-examination, the engineer stated that the mowing takes place by the use of a sickle bar, which is approximately three feet thick, and the mower itself rides on little skids. The State does not rake any grass or debris that is cut, but the debris remains where it falls. There were no records to show when the mowing actually took place in the area involved in the accident. The engineer further stated that there was no regulation against farm vehicles using the shoulder as they saw fit.

"He further testified that they had a program started of putting safety posts at all headwalls, which were broken off. The safety program was part of the general program of knocking the headwalls off. It was not an after thought. The designs and intentions were that knocking out the headwalls and putting up the safety posts would go hand in hand. Unfortunately, District No. 5 ran out of a supply of posts. It was intended to have a post at the culvert before October 2. They did not do so before that date; however, they did get their supply of posts in September.

"Len Parrish testified on behalf of respondent. He was a regular maintenance man, employed by the Highway Department. He stated that he probably mowed the grass and cut weeds on the shoulder of highway No. 10 sometime prior to October 2, although he could not say any special date when he mowed the weeds near the culvert in question. He had no independent memory as to when the actual mowing took place, nor were there any records.

"Robert Norton, a maintenance man for the Highway Department, stated that he did mowing along highway No. 10 east of DeLand, although he had no independent recollection of mowing the specific area. He did not know the condition of the grass or weeds as to this particular culvert.

"In the opinion of this Commissioner, the State of Illinois was guilty of negligence. Claimant's exhibit No. 1 includes the area of the culvert in question. The culvert is not visible in this photograph. Exhibit No. 2 is a photograph of the area showing the relationship of the grass, weeds, shoulder and the culvert. The grass stood about ten inches above the remaining headwall, and the grass was allowed to remain where it fell after mowing. The headwall of the culvert in question should not have been removed, unless some sort of warning could have been put in place immediately upon the removal of the headwall.

"It would appear that the major issue to be determined in this case by the Court is whether claimant was guilty of contributory negligence. There is no question but what claimant has been seriously and permanently injured, and, if the Court determines that he is free of contributory negligence, he should be awarded the maximum amount of $25,000.00."

The crux of this case is whether or not claimant is guilty of contributory negligence, as the negligence of the State is beyond dispute. Since the burden of proving that he was not guilty of contributory negligence is squarely upon claimant, a review of his testimony is pertinent. He stated that he left his home about 6:30 A.M., and that he was driving a tractor, which did not have lights, front or rear. He stated that on the south side of Route No. 10 there were two culverts with the headwalls broken off. One of them was a tenth of a mile from where he turned onto the road. He stated there were no rays of sun visible. There were no landmarks visible.

He further stated that, when he looked back, and saw a car approaching from the rear, "I did not know exactly where I was with reference to the second culvert on the south side. I thought I was by it. I knew such a culvert existed. After I looked back, I pulled off on the shoulder, and kept looking directly in front of me. I went about 400 feet after I pulled off." (Abstract of record, page 29.)

This, in essence, is the testimony offered by claimant to satisfy his burden of proof. Claimant was not a stranger in the vicinity. He had driven between the two places every working day since 1954. (Abstract of record,

page 33.) He knew of the two culverts with the headwalls knocked off, yet he drove his tractor, without lights, into the area where the culverts were located.

"A person may not knowingly expose himself to danger, and then recover damages for an injury, which he might have avoided by the exercise of care for his own safety."

Ames vs. Terminal R.R., 332 Ill. App. 187

Claimant knowingly exposed himself to danger by driving his tractor in this area without adequate lights. He did not exercise ordinary care for his own safety, and was thereby guilty of contributory negligence.

An award is, therefore, denied.